UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>    v.<br><br>HOLLIS P. DAY, JR.,<br><br>       Defendant. | NO. _____<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Hollis P. Day, Jr. ("Day" or "Defendant"), alleges as follows:

## SUMMARY

1. From at least 2016 through 2020 (the "Relevant Period"), Day, a Louisiana-based insurance agent, used various methods to market and sell approximately $8.7 million of securities in risky, unregistered oil and gas offerings (the "Oil and Gas Securities") to at least 45 retail investors, many of whom purchased multiple securities from Day. The Oil and Gas Securities were a series of unregistered securities offerings sponsored by Resolute Capital Partners, LLC ("RCP") and Homebound Resources, LLC ("Homebound").

2. First, Day targeted his existing base of insurance clients for the sale of the Oil and Gas Securities. Then, he used his weekly radio show, "Sage Money Radio," to reach a larger audience and solicit additional investors. On certain episodes of his radio show, he interviewed representatives of RCP and Homebound so they could promote the Oil and Gas Securities.

3. During his broadcasts, Day told listeners that they could avoid the volatility of the stock market by investing in alternative investments like oil and gas, and encouraged them to

1

contact him directly for more information.

4.      Day also contacted prospective investors via email and other methods, including arranging lunch and dinner seminars, where Day and others discussed and pitched the Oil and Gas Securities to potential investors. Day arranged for representatives of RCP and Homebound to attend these seminars so they could further promote the Oil and Gas Securities.

5.      Throughout the Relevant Period, Day held no securities licenses nor was he registered with the Commission in any capacity.

6.      Nevertheless, he sold the Oil and Gas Securities to retail investors and in return received commissions of at least $869,796.

7.      Many of the individuals to whom Day sold the Oil and Gas Securities lost much, if not all, of their investments. This is because the entities in which they invested failed to make interest payments and return principal when the notes held by investors came due.

8.      Day violated the federal securities laws by: (i) actively participating in the offer and sale of securities that were not registered with the Commission; and (ii) acting as a broker in the offer and sale of the Oil and Gas Securities despite the fact that he was not registered with the Commission.

9.      As to the unregistered offerings, Day participated at key points in the chain of distribution of the Oil and Gas Securities, including actively soliciting purchases from investors in this District and elsewhere in the United States. The Oil and Gas Securities offerings were not registered with the Commission nor were they exempt from registration requirements. The risk disclosures in the offering materials and subscription documents for these unregistered securities had not been filed with the SEC.

10.     Day also acted as an unregistered broker. By virtue of his agreement with RCP and Homebound, Day was engaged in the business of effecting transactions in securities for others.

Day actively solicited his clients to purchase the Oil and Gas Securities and received transaction-based compensation in the form of sales commissions from Homebound.

## VIOLATIONS AND RELIEF SOUGHT

11. On account of his conduct as alleged in this Complaint, Defendant violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a) and (c)] and Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)].

12. The Commission seeks a final judgment from this Court: (a) permanently enjoining Defendant from future violations of Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act; (b) permanently restraining and enjoining Defendant, or any entities he controls, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that he not be prevented from purchasing or selling securities listed on a national securities exchange for his own personal account; (c) ordering Defendant to disgorge his ill-gotten gains, together with prejudgment interest thereon; and (d) ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## JURISDICTION AND VENUE

13. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

14. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

15.     Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Among other things, Defendant sent emails to clients around the country advertising investment seminars and the Oil and Gas Securities, hosted a radio show that was broadcast around the country, and engaged in interstate emails and telephone calls with clients and RCP personnel.

16.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, [15 U.S.C. §77v (a)] and Section 27 of the Exchange Act [15 U.S.C. S78aa (a)] because Defendant transacted business here, including certain of the acts complained of in this Complaint occurred in this District.  For example, the Defendant's radio show reached many potential investors in New Orleans.  Furthermore, Day directly solicited at least one investor victim, who resided in New Orleans, to come to his investor seminars.

17.     Defendant and the Commission executed three successive tolling agreements that collectively tolled the running of any applicable statute of limitation deadline from May 1, 2021 to June 1, 2022.  Securities law violations during the Relevant Period are within the five-year statute of limitations for certain relief as set forth in 28 U.S.C. § 2462

## DEFENDANT

18.     **Hollis Patrick Day, Jr., age 45**, resides in Baton Rouge.  Day is an insurance agent licensed in Louisiana.  He is also the owner and operator of Sage Money Radio, which is an investment radio show and podcast that focuses on alternative investments.  Day has never been associated with a registered broker-dealer or registered with the Commission in any capacity.

## OTHER RELEVANT ENTITIES

19.     **Homebound** is a Texas company located in Irving, Texas.  Homebound acted as a

4

project sponsor for RCP's offerings and was responsible for identifying and purchasing the oil and gas wells in which the RCP investment vehicles owned working interests.

20.     **RCP** is a Nevada company with offices in Texas, California and Minnesota.  RCP created numerous oil and gas debt and equity investment vehicles using wells identified by Homebound and its affiliates.

21.     **Thomas Joseph Powell ("Powell")**, age 53, is a resident of Reno, Nevada.  Powell is the owner of RCP and other related entities, and served as the Senior Managing Partner of RCP.

22.     **Stefan Tiberiu Toth ("Toth")**, age 48, is a resident of Frisco, Texas.  Toth is the founder, co-owner, Chairman and Chief Executive Officer of Homebound Financial Group, LP, and also operates and controls its subsidiaries, including Homebound.

23.     A recent Commission Order found that Homebound, RCP, Powell, and Toth violated registration and anti-fraud provisions of the federal securities laws.  *See In the Matter of Resolute Capital Partners, Ltd, LLC, et al.*, AP File No. 3-20597 (Sept. 24, 2021) (the "Homebound Commission Order").  In particular, the Homebound Commission Order found that that their offering disclosures were inadequate and that they made materially misleading statements in marketing the Oil and Gas Securities.  The misleading statements included insufficiently supported oil production projections, assertions about potential tax benefits that were unavailable to certain investors, and incomplete disclosures about potential uses of investor funds, including the amount of funds that would be used for payments to prior debt and equity investors.

24.     Powell, RCP, Toth, and Homebound reached settlements with the Commission in the Homebound Commission Order, which found that they violated Sections 5(a) and (c) and 17(a)(2) and (a)(3) of the Securities Act and Section 15(a) of the Exchange Act.

# FACTS

## I. Background Involving Day

25. Day first obtained his insurance license in connection with his role as a finder for a life settlement company called Life Partners. In addition to selling life settlements, Day also sold traditional whole term insurance and other insurance products to a small network of clients in the Baton Rouge area.

26. During the Relevant Period, Day also hosted a weekly self-described "boutique investment" radio program called Sage Money Radio, in which he extolled the benefits of avoiding classic Wall Street investments, discussed life insurance, and promoted alternative investments, including oil and gas.

27. The show was broadcast on both FM and AM stations in the Baton Rouge area, and was available to a broader audience, including New Orleans residents, online through iHeartRadio. During the Relevant Period, Day solicited investors in the Oil and Gas Securities by frequently mentioning oil and gas investing on his radio show, contacting his existing base of insurance clients via email, sending mass solicitations to marketing lists he purchased from third parties, and hosting informational seminars.

## II. Day Acted as an Unregistered Broker-Dealer through His Radio Show and Seminars

28. In March 2014, Day was introduced to the principals of Homebound through a friend in the life insurance business and began helping Homebound locate potential investors for its smaller oil and gas projects. He signed a marketing agreement that tasked him with "identifying prospective investors" for Homebound's oil and gas offerings.

29. During the Relevant Period, Day sold the Oil and Gas Securities, which were a series of unregistered equity and debt securities offerings designed to raise money for oil and gas exploration and development. Although he had an agreement with Homebound that purported to

6

limit his services to finding and referring potential investors, Day in fact participated in the sale of securities to investors and received compensation in the form of commissions. Specifically, he received a 10% commission on the sale of the Oil and Gas Securities.

30. Day sought prospective investors through general solicitation. He frequently touted RCP and Homebound during his Sage Money Radio program, including conducting multiple interviews of both Powell and Toth and promoting seminars that they would attend. Day discussed his own success investing in Homebound oil and gas projects, and told his listeners that if they were looking for 8-9% returns with very little risk, they should contact him directly for additional information. Day also discussed the "great" tax deduction that was available to certain oil and gas investors.

31. When listeners called or emailed him directly, Day solicited their investment in the Oil and Gas Securities, which offered the hefty returns and low risk he had promoted during his show. He also provided them with details about regular seminars he hosted, which were held at least twice a year at a Baton Rouge restaurant, and featured presentations from RCP and Homebound management.

32. Day further promoted these seminars via email and by distributing flyers to his existing client base. The advertisements for the seminars touted promissory notes with high interest and other "tax-advantaged investments." The advertisements also described the investments as "ideal for short-term money," and noted that they have "great monthly cash flow."

33. Day stated in the advertisement that investors who attended the seminars would "Learn how to invest in Oil & Gas in the Most Profitable Way" and would be taught "[h]ow to capitalize on the Oil & Gas industry in the US today using your IRA and 401k funds." Prospective

investors who received these marketing materials were instructed to contact Day via email or phone to RSVP for the events.

### III.     Day Acted as an Unregistered Broker-Dealer through Hundreds of Emails

34.     Day also marketed and sold the Oil and Gas Securities by sending hundreds of promotional emails to existing clients and other prospective investors, including listeners of his radio show.

35.     For example, in November 2017, Day promoted a debt offering by a Homebound company called PetroRock Mineral Holdings ("PRMH") by sending dozens of emails to prospective investors that attached a glossy marketing document prepared by RCP and Homebound called a "one-pager." The one-pager featured pictures of oil and gas rigs, described the use of investor funds, and promoted annual rates of return ranging from 7.5% to 9%, depending on the length of the investment. In other emails to potential investors, Day attached the PRMH "Executive Summary," a slightly larger and more detailed marketing document prepared by Homebound and RCP.

36.     Day's emails attaching the PRMH one-pager also described the terms of the investment in his own words, including noting that it paid monthly interest and stating that "the paperwork is simple and is done all electronically."

37.     In one email, Day proposed the investment as an alternative to the client's existing IRA, which Day said was "earning very little interest." In another, Day asked his client, "[a]re you still interested in making $20,000 a year in interest?" In an October 2017 email promoting the PRHM offering, Day enticed a client to invest by asking, "[d]o you have any interest in earning 8% for one year" and offered to take the client to visit Homebound's corporate office.

38.     Day's sales practices surrounding the PRMH offering in 2017 were consistent with previous efforts to sell the Oil and Gas Securities. For example, Day sent prospective investors a

one-pager for an RCP/Homebound equity investment known as SEA IV in July 2017 that projected unrealistic cash flow projections and potential profits.

39. In April 2017, Day responded to a radio listener who contacted him by providing separate one-pagers for a joint debt and equity offering by RCP/Homebound called SEA III. In his cover email Day described in detail the benefits and drawbacks of the specific debt versus equity investment. In another email concerning SEA III, Day described the debt portion as a "nice way to hedge your investment" and suggested that the prospective investor purchase both the debt and equity securities.

40. In an August 2016 email promoting a different RCP/Homebound equity and debt offering called HBR VI, Day described the "huge tax advantage" to investing in a 6-well package, noted that he previously invested in twelve oil wells with Homebound and "hit" on eight of them, suggested that the investment could be a "good fit," and offered to arrange a phone call or in-person meeting between the investor and Toth.

41. Day was given a unique link from RCP that he could provide to prospective investors who wanted additional information or who were ready to purchase the Oil and Gas Securities. The link also allowed RCP and Homebound to track the source of incoming investors so they could calculate Day's sales commissions.

42. During the Relevant Period, Day was in regular communication with RCP employees and was informed when one his referrals finalized their investment, including receiving copies their executed deal documents. He also received spreadsheets that allowed him to keep track of the commissions he was owed.

43. Day also reviewed investment paperwork with prospective investors, and facilitated their making the investment. For example, in 2016 Day sat in a truck with two clients in a bank parking lot and reviewed with them paperwork concerning their $250,000 debt investment in a

Homebound debt fund. Following their meeting, the client went into the bank to wire funds for the investment. Day also assisted his clients with renewing their investments as their initial terms were expiring.

44. Between 2016 and 2020, Day sold approximately $8.7 million worth of RCP/Homebound securities to at least 45 investors, and in return received at least $869,796 in commissions.

| Year | Investor Funds | Commissions |
|------|----------------|-------------|
| 2016 | $141,000 | $14,100 |
| 2017 | $822,500 | $82,250 |
| 2018 | $5,008,317 | $500,832 |
| 2019 | $1,812,150 | $181,215 |
| 2020 | $914,000 | $91,400 |

### IV. Day was an Active Participant in the Offer and Sale of Unregistered Securities

45. The Oil and Gas Securities were offered in two forms: (1) membership interests in the oil and gas equity offerings that involved investors paying money to purchase membership interests with an expectation of regular dividends and profits upon the sale of the oil and gas wells; and (2) promissory notes offering fixed interest payments ranging between 8% to 12% and the return of capital upon expiration of the notes.

46. The Oil and Gas Securities were "Securities" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The equity offerings involved investors paying money to purchase membership interests, a common enterprise, and a reasonable expectation of profits based on the efforts of third parties who identified, acquired and drilled the wells. The promissory notes were "notes" as included in the definition of "security" set forth in

Section 2(a)(1) of the Securities Act.

47. The Oil and Gas Securities were sold to Defendant's clients through the use of the means and instrumentalities of interstate commerce.

48. No registration statement was filed or in effect for any of the Oil and Gas Securities. No exemption from registration applied.

49. Day's contribution to the distribution of the Oil and Gas Securities was not *de minimis*. To the contrary, he generated approximately $8.7 million of sales for RCP and Homebound.

50. Day's significant sales efforts were recognized by RCP management, who sent an email to Day and a small group other salespeople in late 2016 thanking them for "another banner year of growth" and noting that their efforts "enabled Homebound to hit new records in production and payback to our investors." In that same email, RCP management described new debt offerings that Day and other salespeople could sell to their clients, attached marketing materials for those offerings, and reminded the salesforce that "referral compensation plans remain the same regardless of the product."

## FIRST CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

51. The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 50, inclusive, as if they were fully set forth herein.

52. By engaging in the acts and conduct alleged in this Complaint, Day, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no

registration statement had been filed with the Commission as to such securities.

53. There were no applicable exemptions from registration.

54. By reason of the foregoing, Day violated, and, unless enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and 77e(c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

55. The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 50 inclusive, as if they were fully set forth herein.

56. Day, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer and while he was not associated with an entity registered with the Commission as a broker-dealer.

57. By engaging in the conduct described above, Day violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

(1) Permanently restraining and enjoining Defendant from, directly or indirectly, violating Sections 5(a) and 5(c) of the Exchange Act [15 U.S.C. § 77(e)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78(o)];

(2) Permanently restraining and enjoining Defendant, or any entities he controls, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security;

provided, however, that he not be prevented from purchasing or selling securities listed on a national securities exchange for his own personal account;

(3) Ordering Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon;

(4) Ordering Defendant to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

(5) Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Date: June 15, 2022

Respectfully submitted,

*/s/ Duane K Thompson*

Of Counsel:
Brian Vann
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Duane K. Thompson, Trial Attorney
Brian Fitzsimons
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
Tele: 202/551-7159 (Thompson)
thompsond@sec.gov